February 5, 1993
 [NOT FOR PUBLICATION]

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

No. 92-1349 

 PETER GRABLER,

 Plaintiff, Appellant,

 v.

 ISRAEL ROIZMAN, ET AL.,

 Defendants, Appellees.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. William G. Young, U.S. District Judge]
 

 

 Before

 Selya, Cyr and Boudin,
 Circuit Judges.
 

 

 Peter Grabler on brief pro se.
 
 Brian P. Flaherty and Wolf, Block, Schorr and Solis-Cohen on
 
brief for appellee Israel Roizman.

 

 

 Per Curiam. On March 7, 1991, appellant Peter Grabler, a
 

resident of Massachusetts, filed a complaint against appellee Israel

Roizman, a resident of Pennsylvania. Jurisdiction was based on

diversity of citizenship. Grabler essentially claimed that Roizman

had breached an agreement to purchase all of Grabler's shareholdings

in Benchmark Broadway Corporation and Benchmark Developers, Inc.

Among other forms of relief, Grabler requested damages (unspecified)

and an accounting. He also included allegations that Roizman had

committed fraud, engaged in economic duress and had violated M.G.L. c.

93A and Section 10(b) and Rule 10b-5 of the 1934 Securities Exchange

Act. The details of the complaint are not relevant to this appeal

because Roizman agreed to pay Grabler approximately $96,000 for the

stock.

 In May 1991, Roizman filed an answer and a counterclaim. The

counterclaim, which essentially forms the basis for this appeal,

concerns the deterioration in the business relationships among

Grabler, Roizman and a third person, David Kohen. These three

individuals are the sole shareholders in Benchmark Properties

Corporation ("Benchmark").* Benchmark is in the business of real

estate development. Specifically, it is a general partner in two

housing projects -- Elm Hill Limited Partnership ("Elm Hill") and Blue

Hill Limited Partnership ("Blue Hill"). Benchmark has a 50% interest

in each project. The other general partners are Benchmark Financial

Group, Ltd. ("BFGL") and an individual, Frank Jones. Each project

also has a limited partnership as its limited partner. Grabler and

Kohen are the sole shareholders of BFGL.

 

*Grabler and Kohen are directors of Benchmark; Roizman holds no
office. All decisions concerning Benchmark must be by a unanimous
vote of the three shareholders.

 In June 1991, the parties reached a final settlement and the case

was dismissed. Paragraphs 2 through 4 of the settlement concern how

much Roizman owed Grabler for the stock purchase and how Roizman was

to effect payment to Grabler. Paragraph 7 of the settlement stated:

 After Grabler and Roizman have reached agreement regarding
 the allocation of expenses and partnership distributions in
 connection with Elm Hill Housing Limited Partnership, Blue
 Hill Housing Limited Partnership and Benchmark Properties,
 Inc., Grabler shall add Roizman as a required signatory on
 the Massachusetts escrow account, as well as all savings,
 checking and other banking accounts maintained by Elm Hill
 Housing Limited Partnership, Blue Hill Housing Limited
 Partnership and Benchmark Properties, Inc. Grabler and
 Roizman agree that they will proceed in good faith to affect
 [sic] a resolution of this issue.

Unfortunately, the obligation to use good faith failed to ensure the

settlement of the disputes concerning Elm Hill, Blue Hill and

Benchmark pursuant to the above paragraph. Also in dispute was

whether Grabler was due interest on the payment for the stock

purchased by Roizman. Thus, on October 15, 1991, the district court

granted Roizman's motion to reopen and set the case for hearing.

 The specific claims presented at that time by Roizman were as

follows: (1) Grabler and Kohen caused Benchmark to pay all of certain
 

expenses incurred by Blue Hill and Elm Hill, despite the fact that

Benchmark only had a fifty percent interest in each project, and the
 

excess costs should be deducted from the profits of Blue Hill and Elm

Hill; (2) Grabler and Kohen each received salaries from Benchmark to

which they were not entitled and, having reimbursed Benchmark for part

of the salaries, still owed Benchmark approximately $23,000; (3) Blue

Hill incurred expenses for deleading and $18,200 of these expenses

were "double deducted" from the profits of Blue Hill; (4) Benchmark

paid for Grabler's personal phone calls in an estimated amount of

$2563; and (5) Benchmark, at the end of 1989, had $50,529 in

 3

development cash (profits from both Elm Hill and Blue Hill) which

should have been distributed to the Benchmark shareholders, Roizman

being entitled to one-third of that amount.

 The district court ultimately found in Roizman's favor on these

five claims, holding that he "is owed the sum of $37,335 as the

appropriate allocation of expenses and partnership distributions in

connection with Elm Hill Housing LP, Blue Hill Housing LP and

Benchmark Properties Corporation ("BPC") . . . ." See Order and
 

Judgment, 2. This order also provided that

 [s]ubject to making provision for the payment of the
 reasonable expenses of BPC in the ordinary course of
 business, Peter Grabler and Israel Roizman are directed to
 take all appropriate action to effect the prompt payment of
 $37,335 to Israel Roizman from the future profits of BPC,
 such payments to be arranged in such fashion as to have the
 same economic effect as if these payments had been made in
 the ordinary course.

Id. 3. The judgment finally stated that if Grabler and Roizman were
 

not able to agree on a method to effect the payment of $37,335 to

Roizman, the court would appoint an independent auditor to recommend

how the payment should be made. Id. 4.
 

 4

 DISCUSSION
 

 Grabler attacks the district court's findings on four out of the

five claims asserted by Roizman.** He also argues that he should

have been awarded interest on the $96,000 owed to him for Roizman's

failure to pay for the stock. We review the district court's factual

findings under the clearly erroneous standard.

 "If the district court's account of the evidence is plausible
 in light of the record viewed in its entirety, the court of
 appeals may not reverse it even though convinced that had it
 been sitting as the trier of fact, it would have weighed the
 evidence differently. Where there are two permissible views
 of the evidence, the factfinder's choice between them cannot
 be clearly erroneous."

Anderson v. Beatrice Foods Co., 900 F.2d 388, 392 (1st Cir.) (quoting
 

Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985)), cert.
 

denied., 111 S.Ct. 233 (1990). In this case, which depends heavily on
 

the inferences to be drawn from conflicting views of the facts, we may

not substitute our opinion as to conclusions reached by the district

court absent clear error. Id. at 392. Keeping this standard in
 

mind, we turn to the disputed findings.

 A. The Counterclaims
 

 1. Roizman asserts that during 1988, 1989 and 1990 Benchmark

incurred certain expenses connected with its operation of Elm Hill and

Blue Hill. Pages D, E and F of Trial Exhibit 6 reflect these costs

for each year. In total, Benchmark paid $221,454 for the years in

question. Roizman's basic claim is that Benchmark should have been

 

** Grabler does not challenge on appeal the district court's
conclusion that, at the end of 1989, Benchmark should have distributed
to the shareholders $50,529 as profits. Issues not raised on appeal
are waived. Cf. Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d
 
1, 3 (1st Cir. 1983) (issues not presented in initial brief are
waived). As for Grabler's contention that Roizman did not have "clean
hands," it was not raised below and is thus forfeited on review.
Johnston v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir. 1979).
 

 5

charged for only half of this amount because it only had a fifty

percent interest in each project. That is, Elm Hill and Blue Hill

should have absorbed half of these expenses. As Roizman explained

during trial: 

 The basis is as follow[s]: When in this industry of low
 income housing when you have a partnership [Benchmark] that
 operates two projects, and that's it, and this partnership is
 supposed to get income for management fee[s], but does not
 receive any management fee because the project is not healthy
 financially to pay the management fee, and there is an
 expense of rent, taxes, interest, copying, office supply, and
 everything else that shows in RD, E and F. When you don't
 have an income to this project, to this company, there is
 someplace where the money has to be paid from. And the only
 place where the money can be paid is from profit that comes
 in from the two entities and that's Elm Hill and Blue Hill.

App. I, Tab 1, at 40. 

 As a result, Roizman concludes, the profits of both limited

partnerships should have been reduced by their respective shares of

the $221,454 in expenses incurred by Benchmark. Accordingly, Note #1

on page A of Trial Exhibit 6 reflects a deduction in the profits of

Blue Hill of $112,942. Similarly, Note #1 of page B of Trial Exhibit

6 shows a reduction in Elm Hill's profits of $108,512.***

 Grabler claims that these calculations are wrong. He first

argues that because Benchmark was running projects in addition to Blue

Hill and Elm Hill, see Trial Exhibit 6, at pages J and K, these other
 

projects also should have absorbed some of Benchmark's costs. Although

not entirely clear, Roizman's accountant, Stuart Briefer (who also had

been the accountant for Benchmark and the limited partnerships),

testified that the costs listed in Trial Exhibit 6 were not all of
 

Benchmark's costs for the years 1988-1990. App. I, Tab 2, at 64.

 

***Although Benchmark has a fifty percent interest in each project,
Blue Hill was charged with fifty-one percent of Benchmark's costs and
Elm Hill was charged forty-nine percent. There is no explanation for
this difference but, in any event, it is not challenged on appeal.

 6

Rather, the inference from the testimony is that the amounts on pages

D, E and F were Benchmark expenses that related solely to Elm Hill and
 

Blue Hill. Id. at 64-65. Grabler did not submit any evidence that
 

would contradict Briefer's testimony.**** 

 Next, Grabler contends that an independent auditor's report, see
 

App. III, Tab 7, at 7 and Tab 8, at 9, demonstrates that Blue Hill and

Elm Hill each paid about $57,811 for their own respective

organizational costs. However, Grabler did not point to any

documentary or other evidence that this money was spent on the same

items listed on pages D, E and F of Trial Exhibit 6. Indeed, there is

no explanation concerning exactly how the independent auditor's report

relates to the payment of Benchmark's expenses. 
 

 Grabler also alleges that Benchmark in fact received income in

the form of management fees for 1988-1990, but assigned this income to

another company, Benchmark Apartment Management Corp. As Grabler

never put in evidence any agreements concerning the assignment of such

fees or any documents indicating the dollar amounts of these fees, we

cannot say that the district court's decision to credit Roizman's view

of the evidence was plainly wrong.

 2. Roizman claims that $18,200 -- which reflects a payment for

deleading at the Blue Hill housing project -- was erroneously "double-

deducted" from the profits of Blue Hill. Thus, as reflected on page A

of Trial Exhibit 6, $18,200 was added to the calculation of Blue

Hill's profits. To support his position, Roizman relies on a document

entitled "Calculation of Syndication Profits," Exhibit RO, #5, and a

 

****Similarly, Grabler's claim that there were no charges for ordinary
expenses such as telephone, rent and copying listed on the pages
concerning these other projects seems irrelevant, without more, to the
question whether Elm Hill and Blue Hill should have been charged with
some of Benchmark's expenses.

 7

record of Syndication Account Transactions for Blue Hill. Trial

Exhibit 7, at 4. 

 It is undisputed that Blue Hill has two accounts -- syndication

and operations. Under this arrangement, the operations account is

funded by the syndication account. It also is undisputed that most of

the expenses for the deleading were paid from the syndication account,

except for the $18,200 which, for some reason, was paid from the

operations account. According to Briefer's testimony, in calculating

Blue Hill's profits, one of the expenses listed in RO #5 is an

"operating deficit" of $75,000. App. I, Tab 3, at 17-19 and App. II,

Tab 1, at 17-20. However, this deficit was reduced by $18,200 -- the

amount for deleading which had been paid out of the operations
 

account. Id.
 

 Although not free from doubt, it appears that Roizman is arguing

that the "double deduction" occurred when $75,000 was wired from the

syndication account to the operations account in December 1990. See
 

Trial Exhibit 7, at 4. Briefer testified that only $56,800 should

have been transferred. App. I, Tab 2, at 61. As a result, not only

did the operations account lay out $18,200 for deleading, but by

transferring the full $75,000, the syndication account also was

charged $18,200. 

 Grabler first argues that Exhibit RO was never admitted in

evidence and that, in any event, it was "superseded" by Exhibit 7.

Exhibit RO contains the underlying documents from which Trial Exhibit

6 was prepared by Roizman and Briefer. The district court admitted

Exhibit 6 in evidence on the second day of trial. App. I, Tab 2, at

32. It later described RO as "part of exhibit 6," App. I, Tab 2, at

59, and referred to it during the course of the trial. As such, it is

 8

plain that RO was considered as admitted in evidence by the district

court. 

 As for Exhibit 7, it is a memorandum, dated September 20, 1991,

from Kohen to Roizman. Page 4 reflects Blue Hill syndication account

transactions for 1990 and 1991. Grabler points out that Exhibit 7

does not list $18,200 as a deduction. He then makes the observation

that RO #5 reflects only an "estimate" of Blue Hill syndication

profits. From this he concludes that the $18,200 was accounted for

only once -- when it was paid out from the operations account.

 Based on the evidence and testimony, we think that the district

court's decision to credit Roizman's explanation was not clearly

erroneous. Exhibit RO #5 was prepared on February 8, 1991. At this

time, the operations account already had paid the $18,200 for

deleading. Indeed, according to Grabler, the operations account paid

this amount in December 1990. This is the same time that $75,000 from

the syndication account was wired to the operations account. See
 

Trial Exhibit 7, at 4. To this extent, it appears that the

calculation concerning the operations deficit of $56,800 (the $75,000

minus $18,200) is not an estimate.

 3. Roizman's claim that Grabler and Kohen agreed to return to

Benchmark salaries they had received is well supported by the

evidence. In fact, in his brief, Grabler candidly admits that he and

Kohen "repaid all but $7,800 of the salary they had each received in

1989" to Benchmark.***** Appellant's Brief, at 33. This

admission lends direct support to Roizman's contention that Kohen and

 

***** Grabler's argument that he and Kohen each retained $7,800
because Roizman allegedly received $7,800 in extra salary is not
relevant to the question whether an agreement concerning repayment
existed.

 9

Grabler had, in fact, agreed to repay the salaries they had received

in 1989. In the absence of any evidence to the contrary, the district

court's finding that Benchmark still is owed approximately $23,000 for

salary reimbursement is not clearly erroneous.

 4. Roizman claims that during 1988, 1989 and part of 1990

Grabler charged all of his personal calls to Benchmark. To support

this assertion, Roizman submitted four cellular one phone bills dated

November 11, 1988, January 8, 1989, July 6, 1989 and September 7,

1989. According to Briefer's testimony, see App. I, Tab 1, at 65-70,
 

he reviewed the above bills, identified Grabler's personal phone

charges, added them up, determined an average monthly figure and

multiplied it by the number of covered months. Page L of Trial

Exhibit 6 contains Briefer's calculations. It reveals that based on

the four phone bills, the average amount of personal phone calls is

$82.66. Thus, for the period June 1988 to December 1990, Benchmark

allegedly paid approximately $2,563 for Grabler's personal phone

calls. Page H of Trial Exhibit 6, which contains the summary of how

the profits of Benchmark should be adjusted, therefore indicates that

Grabler owes Benchmark $2563. Grabler first argues that the claim

must fail because the telephone bills should not have been admitted in

evidence under Fed. R. Evid. 1006 (admission of summaries). Second,

he points out that Briefer testified that he had no recollection

concerning whether Benchmark actually had paid these bills. App. I,

Tab 3, at 25. Indeed, Briefer stated that he could not "recall what

entity paid for the bills." Id. We believe that, even under the
 

clearly erroneous standard, this claim must fail. Therefore, we do

not address the evidentiary question.

 10

 Simply stated, how much Roizman might be due in damages would

depend on which entity paid the phone bills. Assuming Roizman's

figures are accurate, and Grabler owes Benchmark $2,563, Roizman might

be entitled to recover as much as one-third. However, if Blue Hill,

Elm Hill or some other entity paid these bills, the $2,563 repayment

would not go directly to Benchmark. As a result, Roizman would not

receive one-third. For example, if one of the limited partnerships

paid the phone bills, Grabler would reimburse the limited partnership,

and Benchmark, as a fifty percent owner, might be entitled to as much

as one-half of $2,563 or $1,281.50. Roizman's share would be reduced

to approximately $427. As Roizman failed to establish who paid the

phone bills, on the present record it is impossible to calculate the

amount of any damages due.

 B. Interest on the Stock Transaction
 

 The final order of the district court regarding the disbursement

of the purchase price of the stock (which had been held in the

registry of the district court), stated, subject to certain

preconditions not relevant to this appeal, that

 the sum of $96,333.84 shall be released by the Clerk from the
 Registry of this Court to Peter Grabler, representing final
 
 payment to Grabler for his 100 shares of common stock of
 
 Benchmark Broadway Corporation and Benchmark Developers,
 Inc., each, pursuant to paragraph 2 of the Stipulation of
 6/28/91. 

Order of Court, dated November 1991, reproduced in App. III, Tab 17

(emphasis added). 

 Grabler argues that the November 1991 Order only applies to

paragraph 2 -- the underlying obligation of Roizman concerning the

purchase price for the stock -- and not to paragraph 5 which, he

 11

asserts, addresses interest on the purchase price. Grabler also avers

that contrary to Roizman's statement in Roizman's draft order (which

the district court adopted) he (Grabler) never agreed to the language

in Roizman's draft. Grabler points out that the draft order he

submitted to the court, App. III, Tab 18, did not specify that the

$96,000 was a "final payment."

 We are unable to ascertain any basis in the record for Grabler's

claim that he is due interest on the purchase price for the stock

notwithstanding the final judgment of the court.******

Specifically, he has not carried his burden of demonstrating that

paragraph 5 of the June Stipulation applied to the stock purchase. In

any event, it is not clear from the record how such interest would

have been calculated and Grabler, in support of his claim to interest,

has not even established the period during which such interest would

have accrued. Consequently, we decline to disturb the final judgment

of the district court regarding this claim. C. Rule 19 
 

 Grabler finally argues on appeal that the district court failed

to join Kohen, Benchmark, Blue Hill, Elm Hill, BFGL, Jones and the

limited partners of Blue Hill and Elm Hill as indispensable parties

under Fed. R. Civ. P. 19. We note in this context that Grabler never

filed a Rule 19 motion for joinder. Nonetheless, the district court

was aware that it had only Grabler and Roizman before it when it

entered judgment and acknowledged that it was directing enforcement of

 

******Indeed, the only reference the district court made to an
interest claim by Grabler was its statement that it was not persuaded
that Roizman was required to pay interest on the sum of $102,441.
App. II, Tab 2, at 101, which amount appears to relate to the Flipper
Temple deal in Atlanta, not the stock purchase agreement between
Grabler and Roizman.

 12

the June stipulation between Grabler and Roizman.******* For

the reasons stated below, it would be premature to address Grabler's

Rule 19 claim at the present time.

 First, Grabler specifically promised to exercise "good faith"

efforts to reach an "agreement regarding the allocation of expenses

and partnership distributions" in connection with Benchmark and the

limited partnerships. June Stipulation, 7. He entered into the

stipulation, which the court treated as an enforceable contract at

trial, knowing that the resolution of the accounting disputes might

require action on behalf of Benchmark, Blue Hill, Elm Hill and others.

 Second, after both Grabler and Roizman filed post-trial motions

 

* * * * * * *
 Now, it's important to understand that there are before the
 Court only Mr. Grabler and Mr. Roizman. None of the
 corporations have been joined and Mr. Kohen has not been
 joined. The Court infers, but makes no finding, that one of
 the reasons these parties were not enjoined was it would
 destroy the diversity jurisdiction . . . which is necessary
 for this Court to act and the disputes arising out of the
 settlement agreements would then have to be disposed of in
 the state court.

App. II, Tab 2, at 94. As for Grabler's ability to effect the
judgment, the district court stated:

 [W]hile it's certainly appropriate for me to resolve all
 matters as between Mr. Grabler and Mr. Roizman and indeed
 equitably to make sure that those two parties who are before
 the Court give effect to the Court's judgment, I have no
 right to enter orders, nor have I yet entered . . . any order
 against Mr. Kohen. . . .

 . . . .

 So, I can imagine saying, and correct me, that the
 accountings shall be as I decreed them and I order the
 parties before the Court to give effect to the accounting
 resolution that I have made and leave it at that.

Id. at 67.
 

 13

requesting enforcement of the court's final order, Roizman's counsel

filed a letter with the court indicating that "the parties have been

able to agree in [sic] the manner in which to carry out the Court's

Order." Thus, it appears that the means are available with which to

enable Grabler to effect payment to Roizman. Even if any Rule 19

claim has not been waived, it clearly was not addressed below, and is

unripe for review. For the present, therefore, issues relating to the

enforcement of the district court order are properly presented to that

court in the first instance.

 For the foregoing reasons, the case is remanded to the district
 

court for further proceedings consistent with this opinion. The
 

judgment of the district court is affirmed, except as concerns the
 

award of $2,563 to Roizman. SO ORDERED.
 

 14